In the Matter of GREGG W. STONE, Petitioner, v THOMAS SOBOL, as Commissioner of Education of the State of New York, Respondent. (Proceeding No. 1.)

In the Matter of LUISE L. WEINSTEIN, Petitioner, v THOMAS SOBOL, as Commissioner of Education of the State of New York, Respondent. (Proceeding No. 2.)

Third Department, October 31, 1991

**APPEARANCES OF COUNSEL**

*Andrew M. Lawler, P. C. (Maurice M. McDermott* of counsel), for Gregg W. Stone, petitioner.

*Paul K. Rooney, P. C.,* for Luise L. Weinstein, petitioner.

*Robert Abrams, Attorney-General (Brian T. McGovern* of counsel), for respondent.

MAHONEY, P. J.

These combined CPLR article 78 proceedings were initiated by petitioners to review respondent's determinations disciplining them for professional misconduct in their care and treatment of patient A at New York Hospital (hereinafter the hospital) in March 1984. At that time, petitioner Gregg W. Stone, a physician, was a first-year resident at the hospital and the immediate supervisor of petitioner Luise L. Weinstein, an intern. The evidence adduced at consolidated hearings conducted by a Hearing Committee of the Department of Health's Board for Professional Medical Conduct reveals that patient A arrived at the hospital's emergency room as directed by her family physician, Raymond Sherman, at approximately 11:45 P.M. on March 4, 1984 and was initially examined by Maurice Leonard. Patient A informed Leonard that she had a tooth extracted five days earlier and thereafter developed an earache and fever. During the examination, Leonard noted that patient A was "moving her arms and legs in a sort of random fashion". Leonard observed that these movements were "of a volitional nature", prompting consideration that they may be psychological in origin. After Leonard consulted with Sherman and reviewed several laboratory tests, patient A was admitted to the hospital. Leonard then contacted Weinstein and assigned her to patient A's case, and Weinstein, in turn, notified Stone.

Stone then examined patient A, obtaining her medical history and questioning her regarding her use of Nardil, an antidepressant prescribed by her psychiatrist. Stone also spoke with Weinstein, Sherman and patient A's mother. In view of patient A's agitation, Stone twice questioned her, and spoke with her parents, regarding use of narcotics, including marihuana, cocaine and heroin. Although patient A and her parents denied that she had ever used illegal drugs, it was later discovered that patient A did have traces of cocaine in her system.

After the examination, Stone recorded his working diagnosis as "a [suspected] viral syndrome [with] hysterical symptoms, but [the differential diagnosis] should include [several other ailments]". As the Hearing Committee later noted in its findings of fact: "Because the patient could control [her thrashing] when told to do so and also because such seemingly volitional conduct is often associated with the psychological

disorder of hysteria * * * Stone appended to his working diagnosis of 'viral syndrome', the words 'with hysterical symptoms' as a possible explanation for the patient's motor activity." Stone then ordered several additional tests and after consulting with Sherman began treating patient A's symptoms. Stone also suggested a psychological evaluation if all the medical tests proved negative. After completing his treatment plan and concluding that patient A's condition was stable, Stone turned the care and treatment of patient A over to Weinstein at approximately 3:00 A.M. and attended to other patients. At 5:00 A.M. Stone left the hospital and went home, where he was available by remote page.

Weinstein first saw patient A on her way to the emergency room to discuss the case with Leonard. Weinstein then proceeded to patient A's room and reviewed the emergency room records while Stone completed his examination. Stone and Weinstein then discussed treatment plans and the possibility that patient A had ingested illegal substances. Drug testing was planned and a psychiatric evaluation considered because of the volitional component to patient A's agitation.

Weinstein began her own evaluation by taking patient A's history and conducting a physical examination. According to the Hearing Committee's findings, "patient [A] was vague and had a lot of nonspecific complaints". Weinstein questioned patient A more than once on her use of illegal narcotics, which patient A essentially denied despite Weinstein's assurances of confidentiality. After completing her physical evaluation of patient A at approximately 3:00 A.M., Weinstein spent the next hour writing the admission orders and note, ordering tests and setting up a treatment plan essentially the same as that being previously followed for patient A. During this time patient A continued her intermittent "agitation" and Weinstein spent 15 to 20 minutes periodically tending to her, once to replace the intravenous line that patient A had removed. Shortly after 4:00 A.M., Weinstein made a final check on patient A and returned to her assigned floor to care for her other patients.

Between 4:15 A.M. and 4:30 A.M., Weinstein received calls from the nursing staff regarding patient A's agitation and restlessness. Weinstein inquired as to any changes in patient A's medical condition. The attending nurse indicated none but voiced concern that patient A might injure herself. Weinstein directed the use of a bed jacket which restrained only patient A's torso. When this proved ineffective, the attending nurses

restrained patient A's arms and ankles without informing Weinstein, as permitted by hospital regulations. When patient A still failed to calm down, Weinstein was again contacted and asked to return to patient A and sedate her. In response, Weinstein again inquired as to patient A's condition, particularly patient A's appearance and ability to breathe comfortably. Although no changes were noted by the nurse, Weinstein ordered the administration of Haldol to calm patient A and aid her sleep. Patient A was subsequently monitored by the nursing staff three times between 5:00 A.M. and 6:00 A.M., during which she exhibited no distress and was sleeping comfortably.

Weinstein was next contacted regarding patient A at 6:30 A.M. when she was informed that patient A's temperature had risen. Weinstein directed the nurse to arrange for a cooling blanket and to apply cold compresses to patient A. The Hearing Committee found that Weinstein then "proceeded to a conference room on the other end of the floor to collect her medical instruments [and], [a]s she was getting her instruments * * * Weinstein heard the arrest code called and immediately proceeded to patient A's room". The "arrest code" was activated because patient A was in cardiac arrest. Despite resuscitation attempts by hospital staff, including Weinstein, patient A was pronounced dead at 7:30 A.M. While the autopsy report listed bilateral bronchopneumonia as the cause of death, various experts at the hearing testified that the exact cause of death was unknown.

Stone was subsequently charged by the Office of Professional Medical Conduct (hereinafter OPMC) with eight specifications of gross negligence and, based on the same facts, eight specifications of negligence on more than one occasion and failing to maintain a proper hospital record. Weinstein was separately charged with 10 specifications of gross negligence and again, based on the same facts, 10 specifications of negligence on more than one occasion and failure to maintain proper records. At the conclusion of the hearing, the Hearing Committee issued an extensive report setting forth its findings and conclusions and unanimously recommended that all charges against petitioners be dismissed. The Commissioner of Health subsequently reviewed the record and, stating that "both individual [petitioners] exercised their best judgment given the circumstances", adopted the Hearing Committee's findings, conclusions and recommendations in full.

The Regents Review Committee, after reviewing the record

and hearing oral argument, found Stone guilty of gross negligence for improperly diagnosing patient A's condition as "hysterical symptoms" and failing, between 3:00 A.M. and 7:30 A.M., to examine patient A or inquire as to her condition. The Review Committee also made two additional findings of fact and likewise found Weinstein guilty of gross negligence for "[f]ail[ing] to examine [p]atient A after being informed by staff nurses on four occasions of facts relating to [p]atient A's condition which warranted immediate medical attention". Accordingly, the Review Committee recommended that both petitioners be censured and reprimanded. Thereafter, the Board of Regents accepted the Review Committee's findings, conclusions and recommendations, and respondent issued orders to that effect. Petitioners then commenced these CPLR article 78 proceedings seeking to annul those orders.

■ We begin our analysis with a brief summary of the applicable standards which frame our review. The Board of Regents is empowered to supervise the practice of medicine by physicians (see, Education Law § 6506), which includes the power to determine if a physician is guilty of professional misconduct (see, Education Law § 6509) and, if so, mete out appropriate punishment. The Education Law also requires that a determination of guilt by the Board must be based upon a preponderance of the evidence presented (Education Law § 6510 [3] [c]; see, Matter of Sheffield v State of N. Y., Educ. Dept., — AD2d — [June 13, 1991]). The law is equally well settled that "when reviewing an administrative disciplinary proceeding, a court must accept the administrative findings if they are supported by substantial evidence" (Matter of Klein v Sobol, 167 AD2d 625, 627, lv denied 77 NY2d 809; see, Matter of Pell v Board of Educ., 34 NY2d 222). Thus, our review here is limited to deciding whether the Board's determinations that petitioners' guilt was established by a preponderance of the evidence are fully supported by substantial evidence in the record (see, Matter of Edelman v Sobol, — AD2d — [June 20, 1991], appeal dismissed 78 NY2d 1006; Matter of Gwise v Sobol, — AD2d — [June 6, 1991]; Matter of Carrera v Sobol, 163 AD2d 706, 708, affd 77 NY2d 931).

■ Our review is further constrained by the rubric that we may not review administrative findings of fact as to the weight of the evidence or substitute our judgment for that of the administrative body (see, Matter of Sheffield v State of N. Y, Educ. Dept., supra; Matter of Klein v Sobol, supra, at 627). In deciding, however, whether the administrative agen-

cy's determination is supported by substantial evidence, the Court of Appeals has frequently applied the self-evident logic that a finding of no evidence in the record to support the determination cannot suffice as substantial evidence *(see, e.g., Matter of Goldstein v Lewis,* 59 NY2d 706, 708; *Matter of Vogt v Tully,* 53 NY2d 580, 590; *Matter of Richjen Rest. v State Liq. Auth.,* 51 NY2d 847, 849-850). Because we take the view that the record before us contains no evidence that petitioners' treatment and care of patient A, as charged in the relevant specifications, constituted gross negligence on their part, we find that the Board's determinations of professional misconduct and the orders issued thereon are not supported by substantial evidence and must be annulled.

Although the Hearing Committee and the Commissioner of Health found no basis to sustain the charges against Stone, the Board of Regents accepted the Review Committee's finding that Stone was grossly negligent in improperly diagnosing patient A's condition as "hysterical symptoms" and in failing to return to patient A after turning her care and treatment over to Weinstein. We are cognizant of the rule that "[n]otwithstanding the considerable weight to be placed on a hearing body's factual findings, it is the province of the Board of Regents to resolve factual issues and determine witness credibility" *(Matter of Carrera v Sobol, supra,* at 708). Here, however, we find nothing in the record upon which the Review Committee or the Board of Regents could make findings different from those of the Hearing Committee.

At the hearing, Stone presented a profusion of expert testimony, given by several noted physicians, which fully justified both his "working diagnosis" and subsequent treatment of patient A. Those experts concluded that Stone's inclusion of the phrase "[with] hysterical symptoms" was medically appropriate. More significantly, OPMC's expert witnesses, questioned extensively regarding Stone's working diagnosis, were unwilling to state that the inclusion in Stone's notes of the phrase "[with] hysterical symptoms" was a deviation from generally accepted standards of medical practice. On this issue, respondent points out that the OPMC medical experts, Ira Hoffman and Lewis Goldfrank, testified that "hysterical symptoms" was the least likely cause of patient A's agitation and limited the further "medical" treatment she received. Hoffman specifically conceded, however, that patient A *was* being treated for the "medical" portion of her illness, and both Hoffman and Goldfrank testified that attributing patient

A's agitation to hysterical symptoms was one of several correct diagnoses. Regardless of whether the "hysterical symptoms" notation is characterized as a diagnosis or otherwise, all the experts testified that patient A was treated as a medical patient with a medical illness, and the record provides nothing to support the conclusion, reached by the Review Committee, that such notation diminished the care and treatment patient A received.

■ As for Stone's failure to examine patient A or inquire about her condition between 3:00 A.M. and 7:30 A.M., we note that Hoffman stated that such failure was not a deviation from generally accepted medical practices. The uncontested testimony of Stone's experts explained that it was accepted practice in teaching hospitals for residents such as Stone to turn over the care and treatment of patients to an intern after examination and formulation of a treatment plan. Accordingly, we can find nothing in the record before us to support the determination as to Stone.

■ We reach a similar conclusion as to the determination regarding Weinstein. Weinstein was found grossly negligent by the Board in failing to examine patient A after the nursing staff alerted her to patient A's condition which, according to the Review Committee, warranted immediate medical attention. To so conclude, the Review Committee also found that "[p]atient A's condition with regard to her thrashing about had worsened [between 4:00 A.M. and 4:30 A.M.]". In our view, the record contains no factual medical support for concluding that, even given this additional finding, Weinstein was guilty of gross negligence.

The experts testifying for Weinstein found nothing that violated generally accepted medical practice in her failure, upon speaking with the nursing staff, to immediately visit patient A 15 to 30 minutes after having already examined and treated her. Similarly, both Hoffman and Goldfrank concluded that Weinstein's failure to return to patient A within such a short time span was not a dereliction of duties or violation of accepted medical practice. In our view, the record demonstrates that apart from patient A's "thrashing", which Weinstein had previously observed, there is no evidence that patient A's medical condition had changed such that Weinstein was grossly negligent in not returning to patient A immediately. Indeed, the record indicates that the communications from the nursing staff regarding patient A's "condition" were directed toward the possibility of self-injurious thrashing and

requests for sedation rather than changes in her color, breathing or temperature requiring immediate medical attention.

Nor can we agree with the Board of Regents' conclusion that Weinstein inexcusably failed to immediately go to patient A after being told of her 106 degree temperature. The undisputed facts in the record prove that Weinstein went to retrieve her notes and medical equipment and started for patient A's room immediately upon receiving that information and before the cardiac arrest alert was sounded. The record is void of any medical proof that this conduct deviated from generally acceptable medical practice. Accordingly, we find no evidence in the record to support the charges and resulting determination by the Board of Regents that Weinstein was grossly negligent in her care and treatment of patient A.

In sum, the record fails to provide the requisite substantial evidence to support the determinations. We note here that the Court of Appeals has recently determined that a finding of gross negligence requires conduct that is "egregious" *(Matter of Yong-Myun Rho v Ambach,* 74 NY2d 318, 322; *see, Matter of Gandianco v Sobol,* 171 AD2d 965), a standard which we have interpreted as requiring " 'conspicuously bad' " conduct *(Matter of Spero v Board of Regents,* 158 AD2d 763, 764). After reviewing those cases in which physician conduct was found egregious, we take the view that the alleged "misconduct" herein, a conclusion having no medical support in the record, simply cannot be said to be so conspicuously bad as to amount to gross negligence by petitioners in these instances *(cf., Matter of Ross v Commissioner of Educ. of State of N. Y.,* 167 AD2d 569, 570; *Matter of Spero v Board of Regents, supra).* Accordingly, the petitions should be granted and the two determinations annulled.

Finally, we summarily reject petitioners' remaining contentions, neither of which have merit.

CASEY, YESAWICH, JR., and MERCURE, JJ., concur.

Adjudged that the determinations are annulled, and petitions granted, without costs.